1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KATHLEEN J. SEBECK-MARQUEZ,

                    Plaintiff,

        v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                    Defendant.

Case No.  2:16-CV-02043-GMN-GWF

**REPORT AND RECOMMENDATION**

**Re:  Motion for Judgment on
the Pleadings (ECF No. 25)**

        This case involves judicial review of administrative action by the Commissioner of Social

Security denying Plaintiff Kathleen J. Sebeck-Marquez's claim for disability benefits under Title

II of the Social Security Act.  This matter has been referred to the undersigned United States

Magistrate Judge for findings and recommendations on Plaintiff's Motion for Judgment on the

Pleadings (ECF No. 25), filed on January 17, 2017, and the Commissioner's Cross-Motion to

Affirm and Response to Plaintiff's Motion for Reversal and/or Remand (ECF No. 30), filed on

March 27, 2017.

## BACKGROUND

### A.  Procedural History and Factual Background.

        Plaintiff filed a Title II application for a period of disability and disability insurance

benefits on February 20, 2013.  She alleged that her disability began on July 1, 2012.

Administrative Record ("AR") 125.  The Social Security Administration denied Plaintiff's claim

and her request for reconsideration.  AR 74-75, 81-85.  She requested a hearing before an

Administrative Law Judge ("ALJ") which was conducted on January 15, 2015.  AR 32-55.  The

ALJ determined that Plaintiff was not disabled from July 1, 2012 through December 31, 2012

which was the last date she was insured for disability benefits.  AR. 19.  The Appeals Council

denied her request for review on June 30, 2016.  AR 1-6.  Plaintiff then commenced this action

for judicial review pursuant to 42 U.S.C. § 405(g).

    **1.  Disability/Work History Reports, and Third-Party Statements:** Plaintiff Kathleen

Sebeck-Marquez was born in March 1971.   She is 5'5" tall and weighed 136 pounds in May

2013.  AR 162.  She has an eleventh grade education.  AR 164.  Plaintiff has been married to

Glen Marquez since 1993 and has two children, a daughter born in 2002 and a son born in 2009.

AR 125.  Plaintiff was employed in the mortgage industry in California from April 1992 until

November 2007.  AR 153.  She held supervisory positions in some of her jobs.  AR 154-159.

Plaintiff relocated to Nevada in 2007 or 2008, and was unable to find work.  She then had a high

risk pregnancy in 2008-09.  AR 162.   She has not been employed outside the home since 2007

and her last date insured for Social Security disability benefits was December 31, 2012.  AR 139.

    Plaintiff stated in her May 12, 2013 disability report that she became disabled on July 1,

2012 as a result of the following physical and mental conditions:  Lupus, severe back pain,

severe joint pain, severe fatigue and depression.  AR 162.  Her joint and back pain made it

difficult to sit or stand for any period of time without severe discomfort.  AR 172.

    Ms. Sebeck-Marquez completed a function report on April 27, 2013 in which she stated

that she had extreme fatigue that required her to rest frequently throughout the day.  Her joint

and back pain required her to continuously stretch and change positions.  She had trouble

opening containers, lifting and doing repetitive motions like writing and typing.  When she had

headaches, it strained her vision and she had to cover her eyes to avoid additional pain.  AR 142.

Plaintiff performed routine housework, cooking and caring for her 10-year-old daughter and 3-

year-old son.  She also provided food and water for a pet cat and bird.  Her husband, however,

cleaned-up after the pets.  He also helped care for their children on his days off.  Plaintiff

indicated that prior to her illness, she was able to sit, speak, type and stand for extended time

periods.  Her headaches sometimes prevented her from sleeping.  AR 143.

    Plaintiff reported no problems dressing, bathing, caring for her hair, feeding herself or

using the toilet.  It took her longer to shave because she was unable to balance without resting.

AR 143.  She did not need reminders to take care of her personal needs or to take medication.
Plaintiff prepared her own meals, including salads, sandwiches, microwave and complete meals.
She did this three times daily.  After her illness, she made fewer complete meals and rested
during the prep stage.  She did cleaning, laundry and cooking.  She performed laundry and house
cleaning once a week.  Her daily cooking varied.  She sometimes needed help putting things
away or doing the dishes "if I hurt to stand any longer."  AR 144.  Plaintiff went out 2-3 times a
week.  She drove a car and was able to go out alone.  She shopped for food and household needs,
but her husband did the majority of the shopping because she got too tired.  She shopped once a
month for 20-30 minutes.  Plaintiff was able to manage money, pay bills, count change, and
handle a savings and checking account, and money orders.  AR 145.  She read and watched
television on a daily basis unless she had headaches.  It was hard for her to focus on reading,
however, because she had to continuously change positions.  For social activities, she went out to
eat or gamble with her husband.  She talked on the phone with family and friends and
participated on Facebook in short intervals throughout the day.  She went out approximately two
times a week.  Plaintiff did not need reminders to go places and did not need to have someone
accompany her.  AR 146.  She went out less and talked less since the onset of her illness because
she didn't feel well.  AR 147.

Plaintiff reported that her illness affected her ability to lift, squat, bend, stand, walk, sit,
kneel, talk and use her hands.  Her fatigue made basic movements feel strenuous.  Joint pain
caused difficulty walking, standing or sitting for extended periods.  She could walk one-half
block before she needed to stop and rest for a couple of minutes.  She could not walk far because
of the joint pain.  Plaintiff was able to pay attention and follow written or spoken instructions.
She got along well with authority figures and had never been fired from a job because of
problems getting along with others.  She did not handle stress or changes in routine very well.
She noticed that she had a shorter temper and she feared that her doctors were missing
something.  AR 147-148.

Ms. Sebeck-Marquez also completed a headache information form on April 27, 2013.
She described her typical headache as pressure above and below both eyes and at the temple.

The headaches occurred three to four times a week.  She stated that she reported headaches at every medical appointment, but was being seen for "multiple lupus related issues."  She previously took Advil for her headaches, but could no longer do so because of the back pain medicine she was taking.  That medication did not help her headaches.  She further stated: "The frequency of headaches increased dramatically since Jan. 2010.  Recently diagnosed with Lupus – extreme symptoms started July 2012."  AR 152.

Plaintiff completed an updated disability report on June 18, 2013 in which she stated that her level of fatigue and joint and back pain had increased in May 2013.  She was able to sit or stand "for shorter periods of time" and required frequent stretching or rest to slightly ease her pain.  She had gall bladder surgery on May 29, 2013, but it did nothing to decrease her side or back pain.  She had stiff shoulders and severe stomach pain.  AR 175.  The stomach pain began in April 2013.  AR 176.  Her increased fatigue and pain also increased her limitations.  She could only sit or stand for 10-15 minutes without experiencing severe discomfort.  She was frequently so tired that she had to lay down throughout the day.  She could not repeat motions such as typing or washing dishes, and could not lift more than 10 pounds without stiffening of her joints and back.  She no longer drove distances that took more than 15-20 minutes.  She had to stop midway when walking up stairs.  AR 175.  Plaintiff stated that "caring for myself, my children and my home takes longer to complete because I have to rest and stretch throughout.  This includes dressing, hair brushing, general care as well as household chores.  I no longer vacuum because the pain to my feet, back and side is unbearable."  AR 180.  Plaintiff submitted another disability report in November 2013 which indicated no change in her conditions since her June 2013 report.  AR 183-190.

Plaintiff's sister completed a third party function report on December 20, 2014.  AR 212-217.  Her description of Plaintiff's pain, fatigue and other symptoms was made in the present tense.  She did not distinguish Plaintiff's symptoms and condition in 2012 from what they were in 2013 or 2014.

Plaintiff's husband completed a third party questionnaire on January 10, 2015.  Mr. Marquez stated that prior to becoming disabled, Plaintiff was energetic.  She liked dancing, arts

4

and crafts, reading, painting, playing with the kids and gardening. She stopped reading because of her headaches and was frustrated with her memory. Her hands hurt too much for painting, writing or gardening, and she was in too much pain to play with the children. Mr. Marquez stated that Plaintiff spent most of the day laying or sitting on the couch. Plaintiff provided basic child care and did light house cleaning on occasion, when not fatigued. She had trouble concentrating and tired easily from talking or typing. She was often very depressed and gloomy about the future. Mr. Marquez stated that he did all the grocery shopping. Plaintiff rarely participated in family activities. She had trouble helping their daughter with homework, and rarely had enough energy to cook homemade meals. Mr. Marquez described Plaintiff's primary symptoms as chronic headaches, back and side pain, joint pain, stomach pain, and restless sleep due to pain. AR 220-221. Mr. Marquez did not specifically describe Plaintiff's symptoms or limitations during the period between July 1, 2012 to December 31, 2012.

**2. Plaintiff's Hearing Testimony:** The ALJ stated at the outset of the January 15, 2015 hearing that he had to determine whether Plaintiff was disabled during the period from July 1, 2012 to December 31, 2012. Plaintiff's attorney stated Ms. Sebeck-Marquez understood this. AR 35. Plaintiff testified that her last job was as an administrative secretary for the National Association of Mortgage Professionals ("NAMP"). This was a start-up company or organization. She worked there six or seven months and left when the company "folded." AR 37. The ALJ asked Plaintiff whether she could perform her prior work as a loan collection agent if she had to. Plaintiff stated that it would be hard for her to have long conversations and she was having "issues with details." AR 38.

Plaintiff testified that she got pregnant in 2008 after she stopped working. It was a high risk pregnancy. She received shots every day and "had other physical limitations that I wouldn't have been able to work through the pregnancy." She did not know she had lupus until July 2012. Prior to that she attributed the fatigue and other problems she experienced to her second pregnancy. By July 2012, she was having joint pain, headaches, and back pain which had started "well prior to that." AR 39. She was placed on different types of antibiotics before she was diagnosed with lupus. Her doctor told her there was no medication that could cure lupus, but

only medication to treat its symptoms.  Shortly before her lupus was diagnosed, she was prescribed Amitriptyline for headaches and Hydrocodone for joint pain.  AR 40.

Plaintiff testified that her joint pain is exacerbated if she does a lot of walking.  Her fatigue is exacerbated by heat and lack of sleep.  Her body constantly feels like she is just getting over the flu, and she feels worn down all the time.  AR 40.  In 2012, her headaches became so severe that she laid on the couch four or five days a week with icepacks on her head.  AR 40-41. She now had more frequent headaches, but their severity was less.  She described them as consistently mild.  Plaintiff testified that in July 2012, she could walk a block or so before she had to stop and rest.  She could not stand very long because of the pain in her feet which was the worst pain she experienced at that time.  AR 41.

Plaintiff testified that she stopped lifting her 3-year-old son in 2012 because of a shooting pain in her right arm which caused her to almost drop him. AR 44-45.  She had difficulty going up and down stairs, and she only went upstairs to go to bed.  She got dressed every day.  She still had a driver's license, but did not drive very often.  Her cooking was limited to simple tasks such as heating a frozen pizza.  Her husband did the grocery shopping.  AR 42.  Plaintiff still loaded the washer and dryer, but did not put the laundry away because the baskets were too heavy for her to lift and carry.  She stopped lifting the baskets in 2012 about the same time that she stopped lifting her son. AR 42-43, 45.  Plaintiff could no longer operate the vacuum.  She could straighten things up and do light dusting.  Her husband began doing the shopping in 2012 because she would get exhausted if the shopping cart was full and it was hard for her to push it. Pushing the cart also caused knee pain.  After shopping, she would be exhausted and someone would have to help her put the groceries away.  AR 45.  Plaintiff's sister lived with her in 2012 and helped care for her children.  AR 44.  Plaintiff testified that she no longer read much because of headaches, and she no longer wrote journals or participated in crafts with her daughter.  AR 43.

Plaintiff testified that she also had pain in her hands, hips and shoulders.  The pain in her hands and feet was present on a daily basis.  AR 43.  Typing, holding a pen, writing, walking, and standing too long increased her pain.  Before lupus was diagnosed, she thought that her

problems were due to depression or mental issues.  She later learned that her fatigue and other symptoms were caused by lupus.  AR 44.  In 2012, she would do things, such as attending a function at her daughter's school, and upon arriving home, her feet would be swollen, her head would be pounding and she would have to lay down.  Beginning in 2012, she was no longer able to cook big meals.  She became very tired and had bad pain if she did things like cutting, opening things, lifting or taking items out of the oven.  Her condition continued to worsen.  The doctors were vague as to the causes of her symptoms.  She felt that she was never going to get better and that she was no longer able to work.  AR 46-47.  She woke-up a lot of times with pins and needles in her hands and feet.  She would feel fatigued even if she slept 8 hours.  She did not sleep during the day, however, because she tried to stay on her daughter's schedule.  AR 48-49.

Plaintiff believed that cysts in her kidneys caused her chronic back pain.  She experienced upper back pain every day in 2012 which felt like something going through her back and under her rib.  AR 47.  The back pain varied in severity, but was not triggered by anything she could identify. The removal of her gall bladder did not relieve her back pain.  AR 48.

**3. Vocational Expert's Testimony:**  Vocational Expert ("VE") David Dettmer classified Plaintiff's prior jobs pursuant to the Dictionary of Occupational Titles ("DOT") as follows: (1) mortgage clerk, sedentary, SVP-5; (2) bank teller, light, SVP-5; (3) collector, light, SVP-4; and (4) supervisor/credit and loan applications, sedentary, SVP-7.  AR 50.  The ALJ asked the VE to assume the following hypothetical individual:  "A younger individual of 41 years old, with a limited education, and the past work you've just described to me.  The individual would be able to perform work at the light exertional level with the following limitations.  The individual could not more than occasionally climb, balance, stoop, kneel, crouch or crawl." AR 50.  The VE testified that the hypothetical individual would be able to perform any of Plaintiff's past work.  AR 50-51.  The ALJ then added the additional limitation that due to the combined effects of fatigue, the hypothetical individual would be off task 20 percent of the time, or would need to lie down or recline up to two hours during an eight-hour period.  The VE stated that the individual would not be able to perform any competitive work.  AR 51.

Plaintiff's counsel asked the VE to assume that due to fatigue, the hypothetical individual would be limited to simple, repetitive tasks, as well as bilateral use of her hands and fingers on an occasional basis for handling and fingering.  The VE testified that none of Plaintiff's past work qualified as simple, repetitive work, and most of it was hand intensive, involving a lot of keyboarding.  Plaintiff's counsel asked if there were other jobs that the hypothetical person could perform with these limitations.  The VE stated that Plaintiff could work as an information clerk, a cashier II, or a parking lot attendant.  AR 52-53.

**4. Medical Records:**  Plaintiff was seen at Seven Hills Family Practice Clinic between September 9, 2011 and February 5, 2013.  AR 248-263.  She was initially seen by Diane Levin, D.O., on September 9, 2011 to establish care.  Plaintiff complained of (1) pain in her feet which was worse in the morning when she woke up; (2) left hip pain, without trauma, weakness or numbness; (3) pain in the thoracic spine which felt tight, like a spasm, and which sometimes woke her from sleep; and (4) a recent episode of chest pain for which she had gone to the emergency room.  She received a full work-up and was advised that her heart was fine.  AR 263.  Dr. Levin's physical examination findings included palpable tenderness of the planter surfaces of both feet, and mild tenderness to palpation of the left thoracic spine.  Her diagnoses were (1) sprain hip/thigh unspecified, (2) plantar fibromatosis, and (3) thoracic spine pain.  Plaintiff was prescribed Ibuprofen, Soma and Lortab.  A hip x-ray was ordered and she was advised to follow up in two weeks.  AR 263.

Plaintiff was seen by Lorraine Vaughn, APN, for a routine examination on October 5, 2011.  AR 259.  The report for this visit was reviewed and signed off by Kochy Tang, D.O.  AR 262.  Plaintiff denied weight change, fatigue, weakness, fever, sweating, chills, insomnia**,** irritability, headaches, loss of consciousness, seizures, trauma, changes in vision, or swelling of her lymph nodes.  She reported a history of a rare blood disorder, MTHFR.  Plaintiff denied back pain, but complained of joint pain in her hands and feet for which she was taking Ibuprofen and which seemed to help.  She denied motor weakness, muscle atrophy, memory loss, difficulty walking, or difficulty with speech. On physical examination, she appeared to be in no acute distress.  AR 259.  Musculoskeletal examination findings were normal.  Neurological findings

were also normal.  Psychiatric evaluation indicated normal judgment and insight.  Plaintiff was oriented to time, place and person, and there was no evidence of anxiety, agitation or depressed effect.  AR 261.

Plaintiff was seen by Dr. Levin on December 12, 2011 in follow-up to her complaints of back pain.  She reported temporary relief from pain medication, but still had a lot of pain and spasm in her left mid spine, behind her shoulder blade.  She denied any trauma but stated that she did a lot of lifting of her 2 ½ year old son.  Plaintiff denied any weakness or numbness. Examination findings showed that the spine was non-tender to palpation and she had good range of motion.  Straight leg raising was negative bilaterally.  X-rays were ordered and Plaintiff's medications were changed to Flexeril and Ibuprofen.  AR 258.

Plaintiff was seen by an APN on February 25, 2012 regarding a one-week history of fever, green sputum, nasal drainage, and sinus pain.  She was prescribed medication and advised to follow-up when necessary.  AR 257.

Plaintiff was seen by Lorraine Vaughn on August 15, 2012.  The report for this visit was reviewed and signed off by Dr. Tang.  AR 254, 256.  Plaintiff's chief complaints were a chest cold, and sharp right kidney pain that radiated to her upper back.  Plaintiff stated that a high level of protein was found in her urine during an insurance medical examination in May.  She denied fatigue, weakness, insomnia, irritability, headache, loss of consciousness, seizures, dizziness or light headedness.  She denied swelling of lymph nodes or lymph pain.  She also denied acute or chronic joint pain, or swelling of joints.  On physical examination, she was noted to be in no acute distress.  She had full range of motion of the extremities.  Neurological findings were normal and there were no negative psychiatric observations. The diagnoses were proteinuria, acute bronchitis, abdominal pain right upper quadrant and backache NOS.  AR 254-255.

Plaintiff was again seen by Lorraine Vaughn on August 29, 2012.  The report for this visit was also reviewed and signed off by Dr. Tang.  Plaintiff's chief complaint was a non-productive cough.  She reported shortness of breath walking up one flight of stairs.  A CT scan was scheduled for September 5, 2012.  The review of system findings were the same as on

previous visits.  Notably, Plaintiff denied headaches, acute or chronic joint pain, back pain or difficulty walking.  Physical examination findings were normal.  ARE 252-253.

Plaintiff was seen by Basker Periyasamy, M.D. of Nevada Kidney Disease and Hypertension Centers on September 28, 2012 for initial evaluation of her proteinuria.  Dr. Periyasamy prepared a letter-report of his findings to Dr. Tang.  AR 266-277.  He noted that Plaintiff had a history of MTHFR on aspirin, and TTP/HELLP during her first pregnancy, status post pheresis, hypercalcemia, and bilateral renal cysts.

Dr. Periyasamy stated:

> Plaintiff states that over the last month or so, she has felt very tired and noted increased size in her lymph nodes.  She also complained of right lower back pain.  She is not sure whether this is her kidney, though she denies any problems with dysuria.  She states that she has had multiple urine collections, but not sure if she has ever had a urine culture.  In regard to her HELLP/TTP syndrome, patient had this approximately 10 years ago with her first child.  She states that she had to undergo multiple pheresis treatments for the TTP and eventually recovered. . . .  Patient has had a recent 24-hour urine collection that revealed almost 896 mg of protein.  She also had a renal panel that showed preserved renal function with a creatinine of 0.84 mg/dL with GFR of 86 cc/min.  A CT of the abdomen was also done that showed small bilateral renal cysts along with a left adrenal nodule likely an adenoma and bilateral axillary adenopathy.  She currently denies any problems with fever or chills, though she does feel chronically tired.  She denies any chest pain or shortness of breath.  She does have some occasional abdominal pain.  No nausea or vomiting.  No edema.  She also has no history of kidney stones.

AR 266.

Dr. Periyasamy's assessment was proteinuria, renal cysts, and hypercalcemia (elevated calcium in blood).  He referred her for blood work, prescribed Lisinopril for the proteinuria, and referred her for an ultrasound regarding the kidney cysts.  AR 267.

Plaintiff saw Dr. Tang on October 1, 2012.  Dr. Tang noted that Plaintiff "called in severe pain last wk and we called in some Hydrocodone for her.  She is still having that pain and it feels like it's on fire or has a hot metal rod poking into her back.  It is present all day long but then flares intermittently worse.  It's located at L1, L2 on the R side w/a little radiation to the L."  Plaintiff reported gland swelling in her neck, brachial regions bilaterally, and some increased muscle spasms.  She had recently seen a nephrologist who stated that her kidneys were fine, but

asked her to do some blood work.  Plaintiff reported that she was having a heavy menstrual

period.  She used a topical cream for her back pain which helped distract it, but did not make it

go away.  Pain medications were helpful, but caused fatigue.  Plaintiff had a history of TTP, but

had not made an appointment with a hematologist.  She was waiting for the delivery of a CT

Scan to her radiologist so that he/she could obtain a lymph node biopsy.  Under review of

symptoms, Plaintiff complained of fatigue, but not weakness.  AR 250.

On physical examination, Dr. Tang described Plaintiff as alert, anxious, and in mild

distress.  She had limited range of motion of the lumbosacral spine anteriorly and posteriorly.

There was loss of lumbar lordosis.  There was no palpable recreation of pain, but she had some

increased myospasm in paraspinous region L3.  AR 250-251.  Dr. Tang stated as follows:

> I've asked her to make an appt w/ her GYN for 2 weeks because we'll see
> whether her periods improve at that point in time or not.  I did review her CT
> Scan results that she had recently, which made no mention about your [sic]
> uterine tumor or an ovarian cyst or anything that would contribute to this
> abnormal period.  It may have something to do w/ her history of blood
> disorder.  Because of that, I've asked her to make the appt and she can always
> cancel it if her bleeding stops.  My other choice is to put her on some Provera
> and I explained this to her but I don't want to make any of her symptoms
> worse because I don't necessarily know what's going on.  I really have no idea
> what going on w/ her back either and I've explained my confusion about the
> symptoms she's having also.  I may consider doing an MRI of her lumbar
> spine, x-ray, MRI if need be, she's had a lot of radiologic studies recently
> because she has a lot of things going on.  One being her back, two being her
> enlarged lymph nodes everywhere, three this history of some type of
> coagulation defect, four her recent heavy periods and five the recent creatinine
> urea that was worked up or will be worked up by the nephrologist.  She will
> continue to use the pain meds as tolerated and as needed and we'll see what the
> biopsy of the lymph nodes show first.

AR 251.

Dr. Periyasamy saw Plaintiff in follow-up on October 31, 2012 and reported to Dr. Tang

about her complaints and his findings.  AR 264-265.  He noted that the ultrasound revealed

multiple cysts in both kidneys, and that there was one concerning cyst in the left kidney that may

be complex in nature.  Blood work indicated that her ANA [antinuclear antibody] was

significantly elevated.  Dr. Periyasamy stated: "In discussion with patient regarding history of

lupus, patient states that she has been told multiple times that she did not have lupus after being

further investigated.  However, these were done around the time of her first pregnancy."  He

11

noted that Plaintiff was tolerating the Lisinopril well.  She continued to complain of CVA [kidney area] pain which was chronic in nature.  She was taking narcotic pain medication.  Plaintiff denied problems with fever, chills, nausea, vomiting, chest pain, shortness of breath, abdominal pain, diarrhea, or edema.  She continued to complain of joint aches and swelling.  AR 264.  Dr. Periyasamy gave Plaintiff a referral to urology regarding the kidney cyst.  He also referred her to a rheumatologist with respect to her positive ANA, noting that she had joint swelling.  He also stated: "I will go ahead and set her up to have labs done for C3, C4, double-stranded DNA and anti-RNP to evaluate for lupus."  AR 265.

        Dr. Tang saw Plaintiff on February 5, 2013.  Plaintiff continued to have back and side pain.  She was dealing with some non-medical issues.  She stated that her right upper quadrant pain was constant, but varied in intensity.  Food consumption did not affect it.  An ultra sound was reported as normal.  Plaintiff had not yet obtained a hematology appointment for blood work.  She reported some fatigue and weakness and stated that she had lost 7 to 10 pounds.  She felt that she was losing muscle mass in her legs.  She had some heat and cold intolerance, with intermittent chills and fever.  She felt a gurgling in her throat and her vision was worsening.  She felt like her lymph nodes were swollen.  She had palpitations at night and some chest pains.  She was taking Lisinopril, Hydrocodone, and aspirin.  Under review of systems, Plaintiff denied headaches, loss of consciousness, seizures, dizziness, or lightheadedness.  She also denied swelling or pain in the lymph nodes which was inconsistent Dr. Tang's narrative discussion of her complaints.  Plaintiff denied motor weakness, muscle atrophy, difficulty walking or difficulty with speech.

        On physical examination, Plaintiff was alert and in no acute distress.  She was oriented to time, place and person and had normal recent and remote memory.  Dr. Tang's assessment was (1) abnormal findings NEC; joint pain in multiple joints, "Acte & chr cholecystitis"; Proteinuria; and abdominal pain right upper quadrant.  Dr. Tang referred Plaintiff for evaluation by a rheumatologist and hematologist, and instructed her to follow-up with Dr. Tang as necessary.  AR 248-249.

1    Plaintiff was seen by Farheen Rasool, M.D. for a rheumatology evaluation on February

2  22, 2013. AR 371-372.  She noted that Plaintiff was being seen because of her positive ANA.

3  Plaintiff stated that she had been informed 10 years previously that she might have lupus.  She

4  was sent to a rheumatologist and lupus was ruled out.  Under review of systems, Plaintiff stated

5  that she did not have frequent fever or chills.  She had some intermittent night sweats. She did

6  not have chest pain or difficulty breathing.  She did not have abdominal pain, nausea, vomiting

7  or skin rash, but did complain of redness in the face which the doctor stated looked more like

8  rosacea.  A CT scan showed axillary lymphadenopathy and a biopsy was done which Plaintiff

9  stated was noncancerous.  Plaintiff denied any Raynaud symptoms.  She reported a history of

10  DVT [deep vein thrombosis] but did not recall where the clot was.  She also had MTHFR

11  disorder.  AR 371-372.  Plaintiff stated that her joints hurt, as well as her shoulders, elbows and

12  hands.  She noticed some swelling on the elbows and ankles.  Stiffness was minimal.  She stated

13  that her ankles were bothering her more than other joint areas.  AR 372.

14    On physical examination, Plaintiff appeared in no apparent distress. She had good range

15  of motion of the shoulders and there was no active inflammation in the elbows, wrists, hands,

16  knees, feet or ankle.  Internal and external rotation of the hip was good.   Under assessment, Dr.

17  Rasool stated that she "would also like to check the complement levels and antithyroid antibody

18  test." She informed Plaintiff that further treatment would be based on the test results. Dr. Rasool

19  did not see any activity of autoimmune disease, except proteinuria which could be from the

20  multiple renal cysts.  She recommended that Plaintiff follow up with the nephrologist and

21  urologist and consider kidney biopsy, and to return to her in 3 months.  AR 372.

22    Plaintiff was seen by Dr. Michael Finkelstein on February 24, 2013 for an evaluation of

23  renal cysts.  AR 307-310.  He noted that Plaintiff's problem started approximately 7 months ago,

24  and that she initially presented with sharp pain in the back that was relieved by narcotic

25  analgesics.  Under review of systems, Dr. Finkelstein noted weight loss, loss of energy, difficulty

26  sleeping, blurred/double vision, difficulty swallowing, sores in mouth, ear infections, shortness

27  of breath with exertion, chest pain, and leg pain on exertion.  Plaintiff also reported shortness of

28  breath at rest, indigestion/heartburn, peptic ulcer disease, melena, easy bruising, joint or back

pain, and joint swelling.  AR 308.  On examination, Plaintiff was noted to be in no acute distress.

Her respiratory effort was normal.  Her spine was straight with normal range of motion.  There

was no CVA or spinal tenderness.  Dr. Finkelstein's diagnoses and assessments were: (1) renal

cysts--acute problem with complicated clinical course; (2) backache, unspecified—acute

problem with an unclear etiology and undetermined prognosis.  He stated that it was unlikely that

Plaintiff's back pain was caused by her renal cysts.  AR 309.

Plaintiff was seen by Dr. Periyasamy on March 8, 2013 for follow-up evaluation of

proteinuria with possible history of lupus.  AR 345-346.  His letter report was addressed to Dr.

Tang, Dr. Rasool and Dr. Finkelstein.

Dr. Periyasamy stated:

> From a renal standpoint of view, she is actually doing quite well.  Her renal
> function is completely normal.  Her proteinuria has improved from 610 mg of
> protein to now just under 200 mg of protein.  She is on an ACE inhibitor.  Her
> UA [urinalysis] was completely bland with no WBCs, RBCs, or blood in her
> urine.  Currently, she complains of abdominal pain that is burning in nature.
> She is currently not on a PPI.  She also has started a nicotine patch for smoking
> cessation.  She currently denies any problems with fevers, chills, nausea,
> vomiting, chest pain, shortness of breath, diarrhea, or edema.  She does
> complain of ankle and/or joint pain.

AR 345.

Physical examination findings were normal.  On psychological evaluation, Plaintiff was

alert and oriented x3 with normal affect.  Dr. Periyasamy noted that Dr. Rasool had possibly

recommended a renal biopsy, but Dr. Periyasamy was not sure if this was warranted "as her renal

function is completely preserved."  Her urinalysis also showed no evidence of blood or protein

which would be typically seen in lupus.  Dr. Periyasamy stated that he would defer to Dr. Rasool

for possible lupus treatment if that diagnosis was made.  AR 346.

Dr. Finkelstein saw Plaintiff in follow-up on May 23, 2013.  AR 304-306.  He recited her

recent history, and noted that she complained of severe pain which was relieved by narcotic

analgesics and aggravated by anxiety.  AR 304.  Plaintiff complained of blurred/double vision,

shortness of breath at rest, indigestion/heartburn, hot flashes, weakness and numbness in her

extremities and anxiety/panic.  AR 305.  Physical examination of her back revealed that her

1    spine was straight with normal range of motion.  There was no CVA or spinal tenderness.

2    Plaintiff was in no acute distress.  Dr. Finkelstein listed her backache as "unspecified" and stated

3    that she was going to have her gall bladder removed to try to help with her back pain.  AR 306.

4    Plaintiff's gall bladder was removed on May 29, 2013.  AR 335

5         Plaintiff saw Dr. Rasool on June 20, 2013.  AR 400-401.  She noted that Plaintiff had

6    persistent proteinuria which had improved with Lisinopril.  Plaintiff had a positive ANA.

7    Detailed work-up for lupus showed indeterminate anti-double stranded DNA.  The rest of all

8    antibodies were negative.  AR 400.  Plaintiff reported no fevers, chills or difficulty breathing.  At

9    times she felt a heaviness on her chest and felt short of breath.  She had intermittent aches and

10   pains in her joints and muscles.  There was no obvious joint swelling or significant stiffness.

11   Plaintiff sometimes had back pain more on the right side on the muscle.  On physical

12   examination, Plaintiff was in no acute distress.  She had good range of motion of the shoulders.

13   There was no inflammation seen in any joints.  There was good internal rotation of hip, and no

14   active inflammation on knees, feet or in the ankle.  AR 401.  Under "Assessment/Plan," Dr.

15   Rasool stated: "1.  Positive ANA.  I would like to check complement level and a profile 224.  I

16   do not suspect any active lupus symptoms and autoimmune disease symptoms.  2.  For

17   proteinuria, unclear reason, it could be from multiple cysts, I did recommend biopsy.  3. For the

18   myalgia and myositis, I would have the patient on gabapentin.  Discussed with patient in detail

19   all the possible side effects, starting with one capsule and increase to b.i.d. then t.i.d. if tolerates

20   well."  She scheduled Plaintiff for follow-up in 3-4 months.  AR 401.

21        Plaintiff was seen by Dr. Jesus Hernandez on July 25, 2013 for a neurological evaluation

22   of her headaches.  AR 327-329.  Plaintiff reported a history of migraine headaches in her teens,

23   that she had stress and sinus headaches in the past, and stated that "[s]he has had headaches all

24   her life."  Plaintiff state that "[t]he current headache started approximately in March 2012."  It

25   was different from her migraine or sinus headaches.  It was "a pressure-like pain in a generalized

26   distribution with occasional sharp pain in the right parietal, more than left parietal head regions."

27   Plaintiff stated that she was "able to work through the headache," but complained of fatigue.

28   The headaches had occurred daily during the past two weeks.  AR 327.  Under "Assessment,"

Dr. Hernandez stated that Plaintiff's headaches were compatible with tension-type headaches. He noted that she had an essentially normal general physical and neurological examination.  AR 328.

Plaintiff was again seen by Dr. Rasool on October 17, 2013.  AR 415-416.  The doctor noted that Plaintiff had longstanding ANA positive and indeterminate anti-double stranded DNA. She had multiple symptoms including tiredness, joint pains, persistent headaches, dry eyes and dry mouth.  "The patient was diagnosed with lupus."  AR 415.  Under "Assessment/Plan," Dr. Rasool stated: "Systemic Lupus weakly positive blood tests, though persistent positive ANA, discussed with patient already the diagnosis."  AR 416.

Plaintiff saw Dr. Hernandez on October 23, 2013 for follow-up regarding her headaches. AR 418-419.  He noted that she had a reduction in the headache intensity to a dull pressure.  He increased her amitriptyline to 20 mg at bedtime in the hope of diminishing the intensity of the headaches further and decreasing their frequency. AR 418.

**5. Assessment Reports:**  State agency physician Dr. William Dougan reviewed the medical records on May 31, 2013 and opined that there was insufficient evidence upon which the make a determination of disability from Plaintiff's alleged onset date of July 1, 2012 to her last date insured on December 31, 2012.  AR 58-61.  State agency physician Dr. Marcia Foster reviewed the case on September 26, 2013. She noted that there was a change in Plaintiff's condition, with increased symptoms, in May 2013.  Dr. Foster noted that the SLE (lupus) work up started prior to Plaintiff's last date insured, but she was not seen by the rheumatologist before that date.  There was a positive ANA without the criteria for SLE documented in the file.  Dr. Foster also stated that the file was insufficient to assess for disability prior to Plaintiff's last date insured.  AR 70.

 Dr. Tang completed a "Medical Form" on June 27, 2013 in which she listed Plaintiff's diagnoses as chronic pain, myalgias, proteinuria, MTHFR, renal cyst, unknown autoimmune process with positive tests, chronic abdominal pain, and GEND.  The form asked the physician to indicate whether the patient was disabled and, if so, how long the disability was expected to last.

Dr. Tang indicated that Plaintiff was disabled and that it was expected to last 12 months or

longer.  However, she did not fill in a date for when the disability began.  AR 311.

Dr. Tang wrote a letter on October 16, 2013 in which she stated:

> Kathleen Marquez has been a patient in this practice since September 2011.
> She has been seen and evaluated for many medical issues, most prominently,
> total body and joint pains, proteinuria, cholectystitis, abnormal brain MRI and
> a non specific adrenal nodule.  She has had multiple lab tests, radiologic
> studies, specialist evaluations and visits here to this office to try and navigate
> her multiple issues.
>
> She is seen very frequently, possibly once to twice weekly, by the multitude of
> physicians for her medical issues.  She has been prescribed pain medication,
> muscle relaxers, nausea medications and other medications for her symptoms.
> None of these medications are curative and can cause other side effects such as
> malaise, dizziness.  Because she does not have any definitive diagnosis for her
> multiple issues, I cannot give an exact prognosis but I do believe because of
> the progressive nature of her symptoms, this will exceed twelve months.  I do
> not believe she is capable of full time competitive work.

AR 352.

Dr. Tang completed an "Impairment Questionnaire" form on January 30, 2014.  She

indicated that Plaintiff's first date of treatment was September 9, 2011, and her most recent

examination was on January 29, 2014.  She listed Plaintiff's diagnoses as: SLE (lupus), chronic

pain, arthralgia, muscle spasm/weakness, memory loss, TMJ, and carpal tunnel syndrome.  These

diagnoses were supported by positive lab results for SLE and an MRI.  She indicated that

Plaintiff's impairments were expected to last at least 12 months and that she was not a malinger.

AR 354.  Plaintiff's primary symptoms were fatigue and chronic muscle pains.  Her pain was

located all over and was constant.  It was aggravated by movement, sedentary behaviors and

lifting.  Dr. Tang listed the medications that Plaintiff had been prescribed, and stated that she had

also been to physical therapy.  AR 355.

Dr. Tang indicated that in an 8-hour workday, Plaintiff would be able to sit for less than

one hour, and stand and/or walk for less than one hour.  She needed to avoid continuous sitting,

and would have to move around every 10-15 minutes.  Plaintiff was limited to lifting or carrying

less than 5 pounds.  She could never or rarely grasp, turn or twist objects; use her hands/fingers

1   for fine manipulations; or use her arms for reaching.  Plaintiff's symptoms were likely to worsen

2   if she was placed in a competitive work environment.  Her pain, fatigue and other symptoms

3   would frequently interfere with her attention and ability to concentrate.  She would need to take

4   unscheduled breaks every 30 minutes and would need to rest 20-30 minutes before returning to

5   work.  AR 357.  She was likely to miss work more than 3 times a month.  Emotional factors

6   contributed to Plaintiff's physical symptoms and limitations and made them worse.  AR 358.

7   Question 14a on the questionnaire asked the following question: "In your best medical opinion,

8   do your patient's symptoms and related limitations as detailed in this questionnaire apply as far

9   back as **07/01/2012**?"  Dr. Tang checked yes.  AR 358.

10          Prior to the decision of the Appeals Counsel, Plaintiff obtained an "Independent Medical

11   Examination" opinion from Dr. David Ezeanolue, dated January 25, 2016.  Dr. Ezeanolue

12   reviewed Plaintiff's prior medical records and examined her.  AR 575-582.  He opined that

13   Plaintiff has the following problems:  1. Chronic pain syndrome since 2011, 2. Questionable

14   Fibromyalgia, 3. Low back pain, 4. Depression/anxiety, and 5. Headaches.  AR 581.  Dr.

15   Ezeanolue completed a "Pain Assessment" form in which he stated Plaintiff suffers from

16   fibromyalgia and is disabled.  He also checked "yes" in response to the question: "In your best

17   medical opinion, do your patient's symptoms and related limitations as detailed in this

18   questionnaire apply as far back as 07/01/2012?"  AR 574.

19          **B. The ALJ's Decision**

20          The ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f).  At step

21   one, the ALJ found that Plaintiff last met the insured status requirements of the Social Security

22   Act on December 31, 2012.  She did not engage in substantial gainful activity between her

23   alleged onset date of July 1, 2012 and December 31, 2012 (hereinafter the "relevant period").  At

24   step two, the ALJ found that Plaintiff had the following severe medical impairments:

25   degenerative disc disease and lupus.  There was insufficient evidence to support a finding that

26   Plaintiff's headaches were a severe medical impairment during the relevant period.  The ALJ

27   also found that there was insufficient evidence to support a finding of a substantial mental

28   disorder during the relevant period.  AR 14.  At step three, the ALJ found that Plaintiff's

1   impairments did not meet and were not medically equivalent to any condition listed in 20 CFR

2   Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).  AR 15.

3       Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to

4   perform light work as defined in 20 CFR 404.1567(b), except that she was limited to no more

5   than occasional climbing, balancing, stooping kneeling, crouching, and crawling.  AR 15.  He

6   summarized Plaintiff's description of her impairments and limitations in her May 12, 2013

7   Disability Report and her April 27, 2013 Function Report.  The ALJ stated that the available

8   medical record did not provide sufficient objective evidence to support the Plaintiff's alleged

9   symptoms and limitations during the relevant period.  He stated that "the record suggests the

10  claimant is far more capable of performing substantial gainful work than she claims, and that her

11  reasons for filing for Social Security Disability are less than credible."  AR 16.

12      The ALJ stated that Plaintiff "admitted that she stopped working because she 'relocated

13  back to Nevada' and was 'unable to find work' following a high risk pregnancy."  The medical

14  records following her pregnancy and alleged onset date did not support ongoing symptoms or

15  limitations that would keep her from working.  He noted that Plaintiff saw Dr. Tang on August

16  15, 2012, complaining about sharp right kidney pain radiating to her upper back, but that the

17  physical examination findings were normal or unremarkable.  He also noted that Plaintiff

18  returned a week later "for nothing more than a nonproductive cough."  AR 16.

19      The ALJ noted that in September 2012 Plaintiff was evaluated for her proteinuria, and

20  reported that she had been experiencing fatigue for about a month.  She also reported an

21  increased size of her lymph nodes, and complained of right lower back pain.  A CT scan showed

22  renal cysts.  The Plaintiff was started on Lisinopril for her proteinuria.  The ALJ specifically

23  noted that Plaintiff referred to herself as a "housewife" during the September 2012 examination.

24      The ALJ summarized Dr. Tang's report regarding Plaintiff's October, 2012 office visit

25  and examination.  AR 16-17.  He referenced Dr. Tang's statement that "'I really have no idea

26  what's going on w/ her back' and expressed 'confusion about the symptoms that she's having.'"

27  The ALJ stated that there were no further medical records prior to the Plaintiff's last insured date

28  in December 2012.  He quoted Dr. Foster's statement that in order be entitled to benefits,

1   Plaintiff must be found disabled prior to her last date insured and that "'[t]he evidence in the file

2   is not sufficient to fully evaluate [the] claim and the evidence needed cannot be obtained.'"

3        The ALJ briefly discussed Dr. Tang's June 2013 note that Plaintiff was disabled for 12

4   months or longer, and stated that "[i]t appears Dr. Tang believed the claimant was disabled, but

5   could not even identify the source for her symptoms.  [H]er opinion is given little weight."  AR

6   17.  He also gave little weight to Dr. Tang's October 2013 disability opinion, stating that she

7   "essentially admitted her opinion of disability was based on the claimant's subjective complaints

8   and subsequent treatment of her alleged symptoms, sans actual and supporting clinical

9   evidence."  AR 18.  He also stated that Dr. Tang's opinions in the January 2014 Impairment

10  Questionnaire appeared "exaggerated and out of proportion to his/her own treatment record of

11  the claimant.  Indeed, the limitations are inconsistent with the claimant's own statements about

12  her ability to perform daily activities."  The ALJ specifically referred to Plaintiff's statements in

13  her April 2013 Function Report regarding her daily activities.

14       The ALJ gave great weight to the State agency medical opinions which agreed with the

15  objective findings in the record as well as the claimant's statements regarding her capacity to

16  perform daily activities.  AR 18.  Based on his determination of Plaintiff's residual functional

17  capacity, the ALJ found that she was able to perform her past relevant work and was not disabled

18  during the period between July 1, 2012 and December 31, 2012.  AR 19.

19                               **DISCUSSION**

20       **I. Standard of Review**

21       A federal court's review of an ALJ's decision is limited to determining (1) whether the

22  ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the

23  proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v.*

24  *Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence

25  as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

26  reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL

27  1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see*

28  *also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole

and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)); *see also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II. Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other

substantial gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007).  Social Security disability claims are evaluated under a five-step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  The ALJ correctly set forth five steps in his decision, AR 12–14, and they will not be repeated here.

**III. Whether the ALJ Erred in Rejecting the Opinion of Plaintiff's Treating Physician or in Rejecting the Credibility of Plaintiff's Statements Regarding the Severity of Her Symptoms.**

Plaintiff argues that the ALJ erred in giving little or no weight to the opinions of Plaintiff's treating physician and in giving great weight to the opinions of the reviewing physicians.  Plaintiff asserts that Dr. Tang's opinions regarding the severity of Plaintiff's impairments and limitations were entitled to controlling weight.  Alternatively, she argues that Dr. Tang's opinions should have been given greater weight than the opinions of the non-examining State agency physicians.

A treating physician's medical opinion on the nature and severity of a claimant's impairments is entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  Even if the treating physician's medical opinion is not given controlling weight, it may be entitled to greater weight than the medical opinions of examining or reviewing physicians.  The weight to be accorded to a treating physician's opinion is determined by considering a number relevant factors, including (1) the length of the treatment relationship, (2) the nature and extent of the treatment relationship, (3)

the extent to which the treating physician provides evidence to support his or her opinion, (4) whether the medical opinion is consistent with the record as a whole, (5) whether the treating physician is a specialist providing a medical opinion on issues related to her area of specialty, and (6) other factors which may tend to support or contradict the medical opinion. *Id.*

Under the standards in effect when Plaintiff's claim was adjudicated, more weight should generally be given to the opinion of a treating physician than to those of physicians who do not treat the claimant. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The opinion of an examining physician is also generally entitled to greater weight than that of a reviewing physician. *Id.*, at 1012 (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). The weight afforded to a reviewing physician's opinion depends on the degree to which he provides a supporting explanation for his opinions. *Id.* If a treating physician's opinion is contradicted by another doctor's opinion, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence. "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight ... even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

The ALJ, however, is not bound by a treating physician's opinion that a claimant is disabled. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). While a treating physician's evaluation of a patient's ability to work may be useful in the disability determination, a treating physician ordinarily does not consult a vocational consultant or have the expertise of one. "An impairment is a purely medical condition. A disability is an administrative determination of how an impairment in relation to education, age, technological, economic, and social factors, affects the ability to engage in gainful activity." The law reserves the disability determination to the Commissioner. *Id.* at 884 (citing 20 C.F.R. § 404.1527(e)(1)).

In this case, Dr. Tang provided three written statements relating to Plaintiff's alleged disability: (1) June 27, 2013, (2) October 16, 2013, and (3) January 30, 2014. AR 311, 352, 355-358. In rejecting Dr. Tang's June 2013 statement that Plaintiff was disabled, the ALJ stated that

Dr. Tang "believed the claimant was disabled, but could not even identify the source for her symptoms." AR 17. The ALJ stated that Dr. Tang's October 2013 letter only stated her belief that the progressiveness of the claimant's symptoms would preclude her from full time work. The ALJ asserted that Dr. Tang essentially admitted that her disability opinion was based on Plaintiff's subjective complaints and treatment of her alleged symptoms, without actual, supporting clinical evidence. AR 18. In rejecting Dr. Tang's January 2014 opinion, the ALJ stated that the "extreme limitations" she proposed for Plaintiff were not supported by clinical evidence, and were exaggerated and out of proportion to her own treatment records. The ALJ also stated that Dr. Tang's findings were inconsistent with the claimant's own statements regarding her ability to perform daily activities as described in her April 27, 2013 function report. AR 18.

Although the ALJ's decision is not the optimum of analysis, he provided specific and legitimate reasons for rejecting Dr. Tang's medical opinions regarding the severity of Plaintiff's impairments and limitations. The ALJ was not bound by Tang's opinions that Plaintiff was disabled. *McLeod*, *supra*. Dr. Tang's June 2013 and October 2013 statements did not set forth any description of Plaintiff's physical limitations or impairments that would support a finding that she was disabled, either on the dates those statements were made or during the relevant period from July 1, 2012 to December 31, 2012. Dr. Tang's January 30, 2014 assessment of Plaintiff's physical limitations, if accepted by the ALJ, would have supported a finding of disability, at least on the date the assessment was made. Dr. Tang, however, did not provide a description regarding the development or progression of Plaintiff's symptoms and limitations. She checked "yes" to the question: "In your best medical opinion, do your patient's symptoms and related limitations as detailed in this questionnaire apply as far back as **07/01/2012**?" AR 358. It appears that this date was pre-typed on the questionnaire, presumably by Plaintiff's attorney. There was no indication that Dr. Tang made an independent and conscientious determination as to when Plaintiff's symptoms reached a disabling level of severity.

There was evidence in the record that was inconsistent with a finding that Plaintiff impairments had become so severe as to render her disabled prior to January 1, 2013. Plaintiff

alleged that her disability began on July 1, 2012.  In December 2011, Plaintiff complained of a lot of pain and spasm in her left mid spine behind her shoulder blade for which she was prescribed Flexeril, a muscle relaxer, and Ibuprofen for pain.  AR 258.  There is no indication that she was seen by a medical provider during the ensuing 9 months for similar pain until August 15, 2012 when she was seen by Dr. Tang or her medical assistant.  On that date, Plaintiff complained about a chest cold and sharp kidney pain radiating into her upper back.  There was no indication how long Plaintiff had been experiencing this pain.  As the ALJ noted, Plaintiff was next seen on August 29, 2012 "for nothing more than a nonproductive cough."  AR 16.  On September 28, 2012, Plaintiff told Dr. Periyasamy that she had felt very tired "over the last month or so" and she also complained of right lower back pain.  AR 266.  On October 1, 2012, Plaintiff was complaining of severe back pain and was beginning to complain of a variety of symptoms that led to evaluations by various medical specialists, including Dr. Periyasamy in late 2012, Dr. Rasool and Dr. Finkelstein in early 2013, and Dr. Hernandez in July 2013.

The ALJ noted that physical examination findings in 2012 were generally normal or unremarkable.  The objective examination findings did not indicate that Plaintiff was experiencing a level of symptoms that significantly limited her ability to perform activities of daily living or work tasks if she had been employed. AR 16-17.  Some of Plaintiff's more severe symptoms, headaches and stomach pain, did not appear until 2013.  Although Plaintiff told Dr. Hernandez in July 2013, and testified at the hearing in January 2015, that she experienced headaches several times a week in 2012, Plaintiff did not report headache symptoms during her medical visits in 2011 and 2012.  The ALJ was correct in stating that "[t]he record does not contain sufficient evidence to support treatment of a severe medically determinable impairment for headaches during the relevant period."  AR 14.

The ALJ also relied on Plaintiff's April 27, 2013 function report which he found to be contrary to Dr. Tang's January 30, 2014 medical opinion and also contrary to Plaintiff's subsequent testimony regarding the severity of her pain and limitations during the relevant period.  Plaintiff correctly notes that the ability to perform some activities of daily living is not necessarily inconsistent with the inability to perform the physical or mental requirements of full

time employment. It is improper for an ALJ to reject the credibility of a claimant's testimony based solely on her ability to engage in some activities of daily living. *See Garrison v. Colvin*, 759 F.3d at 1016 (citing *Smolen v. Chater*, 80 F.3d 1273, 1287 n.7 (9th Cir. 1996) and *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). The ALJ, in this case, did not misrepresent or exaggerate Plaintiff's April 2013 statements regarding her ability to perform significant activities of daily living. Plaintiff was able to prepare meals three times a day. She did laundry and house cleaning once a week. She drove a car and was able to go out alone. She went grocery shopping once a month. On a mental level, she read and watched television on a daily basis, although she had some difficulty concentrating due to the need to shift her position. She went out to eat and gamble with her husband. She regularly talked on the phone and used Facebook on a daily basis. She was able to handle finances. AR 143-147. Based on these statements, the ALJ could reasonable conclude that Plaintiff's impairments did not preclude her from performing full time light work during the period from July 1, 2012 to December 31, 2012.

Plaintiff argues that the State agency physicians' statements were equivalent to no opinion at all. This is incorrect. It was Plaintiff's burden to prove that her symptoms and limitations were disabling. By stating that there was insufficient evidence upon which to make a disability determination, the physicians were, in effect, stating that Plaintiff had not met her burden. The ALJ reasonably accorded great weight to these opinions on the basis that they were more consistent with the record as a whole.

Absent evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the severity of her symptoms. *Garrison*, 759 F.3d at 1013-14 (citing *Smolen* 80 F.3d at 1231, and *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)). The ALJ noted that Plaintiff stopped working in 2007 for reasons other than actual disabling symptoms. AR 16. This is not a persuasive reason for rejecting Plaintiff's credibility. Plaintiff's own allegations and testimony affirm that her symptoms did not become severe until several years after she stopped working. The fact that she stopped working in 2007 for reasons unrelated to disability, does not mean that she was able to work at a later point in time after she began experiencing severe symptoms. The ALJ was on firmer ground in rejecting

the credibility of Plaintiff's statements and testimony based on the objective medical evidence and her own April 2013 function report. The record indicates that Plaintiff began to experience significant symptoms in the latter part of 2012. These symptoms were presumably related to her lupus which was not confirmed as a diagnosis until October 2013.[1] It is not clear from the record, however, that Plaintiff's symptoms and limitation had reached a disabling level of severity prior to January 1, 2013.

## CONCLUSION

Plaintiff has the burden of proving that her symptoms and limitations became disabling during the period from July 1, 2012 to December 31, 2012. Although there was evidence in the record that could support such a conclusion, there was also substantial evidence to support the ALJ's contrary conclusion. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Judgment on the Pleadings (ECF No. 25) be **denied**, and that the Defendant's Cross Motion to Affirm (ECF No. 30) be **granted**.

## NOTICE

Pursuant to Local Rule IB 3–2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the

. . .

. . .

. . .

---

[1] It appears that Dr. Rasool hesitated to make a diagnosis of lupus prior to October 2013 because the laboratory findings were not consistent with that condition. She eventually made that diagnosis and the ALJ properly accepted it as a severe medical impairment in his decision.

District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

Dated this 18th day of July 2018.

**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**